**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>EQUIPMENT ACQUISITION RESOURCES, INC.,<br><br>    Debtor | Chapter 11<br><br>Case No. 09-B-39937<br><br>Hon. Donald R. Cassling |
| WILLIAM A. BRANDT, JR., solely in his capacity as Plan Administrator for Equipment Acquisition Resources, Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>IBM CREDIT, LLC,<br><br>    Defendant | Adversary Proceeding No. 11-02227 |
| WILLIAM A. BRANDT, JR., solely in his capacity as Plan Administrator for Equipment Acquisition Resources, Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>TD BANKNORTH LEASING CORPORATION,<br><br>    Defendant | Adversary Proceeding No. 11-02582 |

**NOTICE OF MOTION
<u>WITH CERTIFICATE OF SERVICE</u>**

    TO:   SEE ATTACHED SERVICE LIST

    **PLEASE TAKE NOTICE** that on **April 4, 2017** at **11:00 a.m.** or as soon thereafter as counsel may be heard, I shall appear before the Honorable Donald R. Cassling, in courtroom 619, or before any other Judge who may be presiding in said Judge's place and stead, at the United States Courthouse, 219 South Dearborn, Chicago, Illinois, and shall present: *Joint, Consolidated Motion in Limine and Memorandum of Law to Exclude Report and Testimony of Rex Homme*, copies of which are hereby served upon you.

Dated: February 14, 2017

Respectfully Submitted,

By:   /s/   *Jeffrey D. Ganz*
One of the attorneys for TD Equipment Finance, Inc., successor by merger to TD Banknorth Leasing Corporation

Jeffrey D. Ganz (ARDC No. 6307515)
Riemer & Braunstein LLP
71 S. Wacker Drive, Suite 3515
Chicago, Illinois 60606
Telephone: (617) 880-3568
Facsimile: (617) 692-3568

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2017, I electronically filed the foregoing *Notice of Motion, Joint, Consolidated Motion in Limine and Memorandum of Law to Exclude Report and Testimony of Rex Homme* and *Proposed Order* with the clerk of Court using the CM/ECF system; copies of which will be served upon the following parties referenced below via the CM/ECF notification system and by email on February 14, 2017:

*Attorneys for Plaintiff*:

Allan B. Diamond, (*pro hac vice)*
adiamond@diamondmccarthy.com
J. Maxwell Beatty (*pro hac vice*)
mbeatty@diamondmccarthy.com
Frances Ellenbogen (*pro hac vice*)
fellenbogen@diamondmccarthy.com
Diamond McCarthy LLP
909 Fannin, Suite 1500
Houston, Texas 77010

*/s/ Jeffrey D. Ganz*
Jeffrey D. Ganz

2099702.1

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>EQUIPMENT ACQUISITION RESOURCES, INC.,<br><br>      Debtor | Chapter 11<br><br>Case No. 09-B-39937<br><br>Hon. Donald R. Cassling |
| WILLIAM A. BRANDT, JR., solely in his capacity as Plan Administrator for Equipment Acquisition Resources, Inc.,<br><br>      Plaintiff,<br><br>v.<br><br>IBM CREDIT, LLC,<br><br>      Defendant | Adversary Proceeding No. 11-02227 |
| WILLIAM A. BRANDT, JR., solely in his capacity as Plan Administrator for Equipment Acquisition Resources, Inc.,<br><br>      Plaintiff,<br><br>v.<br><br>TD BANKNORTH LEASING CORPORATION,<br><br>      Defendant | Adversary Proceeding No. 11-02582 |

**JOINT, CONSOLIDATED MOTION *IN LIMINE* AND MEMORANDUM OF LAW TO EXCLUDE REPORT AND TESTIMONY OF REX HOMME**

      IBM Credit, LLC ("IBM Credit") and TD Equipment Finance, Inc., successor by merger to TD Banknorth Leasing Corporation ("TDEF") (collectively, "Defendants"), through their undersigned counsel, hereby move to bar certain opinions disclosed by Plaintiff's expert witness Rex Homme ("Homme") from introduction at trial. In support, Defendants state as follows.

1

## Introduction

Despite admitting that an opinion that EAR committed fraud would constitute a legal conclusion, and performing no investigation into whether EAR committed fraud, Plaintiff's expert Rex Homme disclosed the following opinion:

> [I]t is my opinion that between 2005 and 2009 ("review period"), lease payments to the financial institutions associated with fraudulent financing activity significantly exceeded the sources of funds from potentially legitimate sources of cash. EAR by itself and/or through its relationship with Machine Tools Direct, Inc. ("MTD"), obtained fraudulent financing from financial institutions to pay off obligations that arose from earlier fraudulent transactions.

(Homme Report at 3 ¶ 7.) Likewise, at his deposition, Homme repeatedly characterized the transactions between EAR and MTD — including those that involved equipment financed by IBM Credit and TDEF — as "fraudulent" or "illegitimate" financing transactions. Homme uses the phrase "fraudulent" seventy-one (71) times in his report alone, and did so innumerable times at his deposition.

For two reasons, IBM Credit and TDEF respectfully request that this Court: (a) bar Homme from testifying that transactions between MTD and EAR constituted "fraudulent" or "illegitimate" financing transactions; (b) strike all references in Homme's report describing transactions as "fraudulent" or "illegitimate"; and/or (c) strike Homme's expert report in its entirety. First, as Homme admitted, any opinion that EAR conducted "fraudulent" or "illegitimate" transactions constitutes an inadmissible legal conclusion. Second, any testimony from Homme that EAR committed "fraudulent" or "illegitimate" transactions would be unreliable. Homme emphasized that he was not engaged to opine on whether EAR committed fraud, and did no investigation into whether EAR had done so. Thus, he lacks any foundation for offering such an opinion.

**Background**

In his expert report (attached as Exhibit A to the Declaration of Counsel), Homme summarized his engagement in this matter as follows:

> StoneTurn was engaged by Diamond McCarthy LLP to perform a forensic analysis of the financial operations of Equipment Acquisition Resources, Inc. ("EAR") and the payments EAR made to the Defendant in this matter. Specifically, we were asked to assess sources and uses of cash from 2005 to 2009 to determine if EAR had sufficient potentially legitimate sources of cash to meet existing debt obligations related to certain financing transactions with financial institutions and finance companies, including the Defendant and other adversary Defendants, as further described below.

(Homme Report, Ex. A, ¶ 3.)[1] Homme was not, however, engaged to investigate whether fraud occurred at EAR: "I was not asked to investigate fraud." (Homme Dep. Vol. I, 85:23-86:2, attached as Exhibit B.) As such, he repeatedly testified at his deposition that it was "outside of my scope" to express any opinion on whether fraud occurred at EAR. (*E.g., id.* at 13:22-14:11; *infra* in Argument section.) Homme also conceded that any finding of fraud "is a legal determination." (Homme Dep. Vol. II, at 346:18-20, attached as Exhibit C.)

Nevertheless, Homme disclosed the following opinion:

> [I]t is my opinion that between 2005 and 2009 ("review period"), lease payments to the financial institutions associated with fraudulent[2] financing activity significantly exceeded the sources of funds from potentially legitimate sources of cash. EAR by itself and/or through its relationship with Machine Tools Direct, Inc. ("MTD"), obtained fraudulent financing from financial institutions to pay off obligations that arose from earlier fraudulent transactions.

---

[1]   In light of the large volume of documentation included as exhibits to the Declaration of Counsel, we have elected to file that document only in the IBM adversary proceeding. Attached as Exhibit A to the Declaration of Counsel accompanying this Motion is Homme's expert report filed in the adversary proceeding against IBM Credit. Homme's expert report filed in the adversary proceeding against TDEF is almost identical; all opinions challenged in this Motion appear in Homme's reports against both IBM Credit and TDEF.

[2]   The following footnote appears in Homme's above-quoted opinion: "I am not providing a legal opinion as it relates to the use of the term 'fraud' or 'fraudulent,' but am referencing information described in the plea agreement and/or testimony of Mark Anstett."

3

(Ex. A, ¶ 7.) Homme expressly disclaimed having any substantiation other than the Plea Agreement of Mark Anstett for choosing to label the transactions as "fraudulent." (*Id*. ¶¶ 3, 13, 14; Ex. C, Homme Dep. Vol. II, 344:23-25.) He also admitted he did not investigate the veracity of Anstett's statements: "is it fair to say that you did not take any steps to verify the truth of the Anstett – the statements in the Anstett plea agreement? A. I did not take any specific steps to verify that information." (*Id*. at 299:6-11; *see also id*. at 369:10-18.) Homme also conceded that Anstett never pleaded guilty to engaging in any fraudulent conduct regarding IBM Credit, and that he never mentioned IBM Credit at all in his Plea Agreement. (*Id*. at 370:15-21.) The same holds true for TDEF.

In his report, Homme opined that there were three types of transactions in which EAR and MTD engaged that in his view constituted "fraudulent financing transactions." (Ex. A at ¶ 24, 31.) "I was looking at flow of funds between these entities and from the financial institution to MTD and to EAR. And I was looking at those flows to calculate and classify my transactions." (Ex. C, Homme Dep. Vol. II, 442:21-25.) Homme opined:

> Based upon our review, we identified three primary scenarios of fraudulent transactions. In scenario 1, the financial institution acquired the equipment from MTD. In scenario 2, EAR or MTD created false and fraudulent invoices to be submitted to financial institutions to reflect that EAR was purportedly acquiring equipment from MTD. In both scenario 1 and 2, MTD received cash proceeds from the financial institution and remitted approximately 98% of the proceeds to EAR. In scenario 3, EAR would enter into a financing transaction with a financial institution and provide a fraudulent invoice from MTD to EAR for equipment that EAR purportedly purchased from MTD. This equipment would serve as collateral for the loan. In scenario 3, EAR would receive the proceeds directly from the financial institution. These scenarios are discussed further below.

(Ex. A ¶ 31; *see also* ¶ 34.)

Homme testified that IBM Credit financed equipment in "scenario 2" transactions, and that TDEF financed equipment in either scenario 1 or 2 transactions. (Ex. C, Homme Dep. Vol. II,

4

455:19-20 (regarding IBM Credit); *id.* at Ex. B, Vol. I, 138:5-141:18 (regarding TDEF).) Despite such transactions being premised on the "purported" acquisition of equipment and EAR or MTD's creation of fraudulent invoices, however, Homme admitted that he had no opinion as to whether the invoices and purchase orders generated by EAR and MTD were falsified or fraudulent. (*Id.* at 190:11-24; *see also id.* at 103:20-104:1.) Nor did he examine, or form any opinions, on whether MTD or EAR actually bought or sold the equipment that lenders (including IBM Credit or TDEF) had financed. (*Id.* at Ex. C, Vol. II, 284:14-17; 399:12-400:1; Vol. III, 538:2-24, attached as Exhibit D.) A full recitation of Homme's lack of investigation into EAR's purported fraud is set forth in the Argument section below.

**Legal Standards**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). To be admissible under Rule 702, Plaintiff must show that Homme's opinions "(a) . . . will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "The objective of [*Daubert*] is to ensure reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 818-19 (7th Cir. 2014). *See also United States v. Lupton*, 620 F.3d 790, 798-99 (7th Cir. 2010) (stating same and affirming exclusion of expert testimony that criminal defendant did not commit fraud because opinion was unreliable.) Moreover, experts "may not testify 'as to legal conclusions that will determine the

5

outcome of the case' under Rule 702." *Scottsdale Ins. Co. v. City of Waukegan*, 689 F. Supp. 2d 1018, 1022 (N.D. Ill. 2010) (quoting *Good Shepherd Manor Found. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003) (affirming exclusion of expert testimony that consisted of legal conclusions)); *In re Commercial Money Ctr., Inc.*, 737 F. Supp. 2d 815, 844 (N.D. Ohio 2010) (stricken expert report included "blatantly improper legal conclusions. Cadle shows no hesitation in opining as to the Sureties' alleged fraudulent intent . . . .").

As explained below, Homme's opinions in his report and deposition testimony that EAR engaged in "fraudulent" and "illegitimate" financing transactions are inadmissible under Rule 702 and *Daubert*. He should be barred from offering such testimony at trial, and all such references in his expert report should be stricken.

**Argument**

**I. Homme's Opinions that EAR Conducted "Fraudulent" or "Illegitimate" Financing Transactions Are Inadmissible Legal Conclusions.**

The first reason why Homme should not be permitted to testify that EAR conducted "fraudulent" or "illegitimate" transactions is that such testimony would constitute inadmissible legal conclusions — a fact of which Homme is well aware.

As an initial matter, a perplexing tension exists within Homme's testimony. On the one hand, Homme freely described EAR's dealings with MTD as "fraudulent financing transactions" in his expert report and at his deposition. On the other hand, he expressly disclaimed that he was opining that the transactions were "fraudulent": "on page 3 of my report, footnote 2, I talk about the use of the term 'fraud' and 'fraudulent,' again, not – I'm not providing a legal opinion." (Ex. B, Homme Dep. Vol. I, 21:8-11.)[3] Homme also testified:

---

[3]  While Homme professed that he is not opining on whether the EAR/MTD transactions were fraudulent, his Report and deposition testimony reveal just the opposite. Homme's Report states: "If MTD owned this equipment in Scenarios 1 and 2, MTD would not have reason to remit the proceeds it received

6

A. I've never expressed a legal opinion on fraud. That's outside of my scope.

Q. Is that the only type of opinion that might exist with respect to fraud, a legal opinion?

A. I'm not sure.

Q. So is it fair to say that in connection with the three reports that you prepared you did not conclude that fraud was occurring with respect to any of the issues that you were addressing?

A. Again, <u>I did not provide any opinion on fraud</u>. But I do not think that either of [my] reports involved fraudulent or looking at consideration of fraud.

(*Id*. at 13:22-14:11)(emphasis added).

A: And just to be clear, my report does reference that I used the term "fraud" or "fraudulent." It does – it's not a legal interpretation, and it's – it's also referenced in the plea agreement and testimony by Mark Anstett. Yesterday Mr. Ganz had asked me my definition of fraud and I quoted Black Law's Dictionary of what fraud was. Again, my view is as an accountant, as a [certified fraud examiner], <u>and I'm not giving an opinion on fraud</u>.

(*Id*. at Ex. C, Vol. II, 344:4-13) (emphasis added). "Again, my analysis is not to give an opinion on fraud. The category that I used was to describe those transactions. So I am not giving an opinion as to this was a fraud transaction as -- as reflected by Mr. -- or in Black's Law definition." (*Id*. at 345:17-23.) "I'm not providing any opinion on fraud. It's a legal — legal determination. (*Id*. at 346:18-20.)

Despite knowing that an opinion that EAR committed fraud would be a legal conclusion, Homme constantly describes EAR's conduct as "fraudulent," "illegitimate," or "fraudulent financing transactions." This Court should bar Homme from opining that EAR and MTD's transactions — in particular those involving equipment financed by IBM Credit and TDEF —

---

to EAR. This is evidence that the transactions are not legitimate, so we classified these transactions as fraudulent." (Homme Report at 15 ¶ 15; *see also id*. at 14 ¶ 34.) Thus, Homme did indeed classify the EAR/MTD transactions as "not legitimate" and "fraudulent."

7

were "fraudulent," as such testimony would be an improper legal opinion that could determine the outcome of this adversary proceeding. For the same reasons, the Court should strike all references in Homme's expert report that the EAR/MTD transactions were "fraudulent." *Amari Co. v. Burgess*, No. 07 C 01425, 2012 WL 5389787, at *8, *15 (N.D. Ill. Nov. 2, 2012) ("Defendants . . . object to Newman's testimony about legal issues that will determine the outcome of the case, such as whether ITA committed fraud. The Court will not allow such testimony. . . . The Court also grants the motion to exclude Breeman as an expert. At the risk of sounding like a broken record, Breeman's disclosed opinion — that the defendants did not participate in fraud — is a legal conclusion he is unqualified to make and which is not properly the subject of expert testimony."); *Ass'n Ben. Servs., Inc. v. AdvancePCS Holding Corp.*, No. 04 C 3271, 2005 WL 2335484, at *4 (N.D. Ill. Sept. 23, 2005) ("Dr. Kravis' opinions regarding the fraud claim fare no better. Dr. Kravis defines fraud by setting forth a definition from Black's Law Dictionary. He then summarizes documents and other evidence he reviewed and reaches the conclusion that AdvancePCS committed fraud by deliberately deceiving ABS. His conclusion that AdvancePCS committed fraud extends beyond the permissible scope of expert testimony."); *Apotex Corp. v. Merck & Co.*, No. 04 C 7312, 2006 WL 1155954, at *8 (N.D. Ill. Apr. 25, 2006) (excluding expert opinion: "Much of Apotex's expert testimony . . . consists of plainly inadmissible legal conclusions concerning Merck's alleged fraud and would be completely unhelpful to the fact finder."); *Klackzak v. Consolidated Med. Transp., Inc.,* No. 96 C 6502, 2005 WL 1564981, *8, 10 (N.D. Ill. May 26, 2005) (holding that expert could not testify that defendants committed fraud within the meaning of the Anti-Kickback statute); *Dahlin v. Evangelical Child & Family Agency,* No. 01 C 1182, 2002 WL 31834881, *3 (N.D. Ill. Dec. 18, 2002) ("Lorandos may not testify regarding opinions 4 and 5 — that Evangelical's actions constituted fraud.").

For the same reasons, the Court should strike all references in Homme's report, and Homme should be barred from testifying, that the transactions between EAR and MTD were "illegitimate" — a term he used repeatedly in his report and deposition to describe EAR's business dealings with MTD. Homme even admitted he used the term "illegitimate" in his report interchangeably with "fraudulent": "the illegitimate is similar to fraudulent financing transactions . . . . I think I could use those interchangeably from my perspective." (Ex. C, Homme Dep. Vol. II, 342:19-343:1.) *See Dahlin*, 2002 WL 31834881, at *4 (barring expert from testifying as to whether defendant was "honest" in certain answers for same reasons as barring him from testifying that defendants committed "fraud."); *Apotex*, 2006 WL 1155954, at *8 ("several judges in this district, including this Court, have held that expert testimony is not helpful to a trier of fact when the expert simply opines that an individual acted dishonestly or fraudulently, issues traditionally resolved by a trier of fact.")

**II. Homme's Opinion that EAR Conducted "Fraudulent" Financing Transactions is Unreliable.**

As a second reason to bar Homme from testifying that EAR and MTD conducted "fraudulent" or "illegitimate" financing transactions, Homme employed no methodology recognized in the equipment leasing industry to reach his apparent conclusion. Instead, by his own admission, he simply relied on Mark Anstett's plea agreement to conclude that EAR had conducted a fraudulent scheme, but took no steps to verify Anstett's claims. (Ex. A, Homme Report ¶¶ 3, 13, 14; Ex. C, Homme Dep. Vol. II, 299:6-11; 369:10-18.) As such, any such testimony from Homme would be wholly unreliable, and thus in violation of Rule 702 and *Daubert*. Nor does Homme's "common sense" approach to analyzing the MTD/EAR transactions constitute admissible "expert" testimony.

9

The Court's task of evaluating the reliability of Homme's opinions is made easy by Homme's own concessions: he admitted that he did not employ any methodology to determine whether EAR had conducted fraud. Homme conceded: "Q. Can we just clarify whether this engagement, the one for EAR, was one in which you were asked to investigate fraud? A. I was not asked to investigate fraud." (Ex. B, Homme Dep. Vol. I, 85:23-86:2.) As such, he had no opinion as to which persons may have conducted any fraud at EAR: "I'm not providing any opinion on who the individuals were. . . . It was not part of our engagement." (*Id.* at Ex. C, Vol. II. at 318:20-21; 319:20-21; 325:15-18.) He did not investigate when the fraud began: "Q. So from your perspective, you don't know whether fraud preexisted in 2005 or not? A. Again, I have no opinion on, you know, from a legal perspective on, on fraud." (*Id*. at Ex. D, Vol. III, 541:9-12.) He did not interview any employees of EAR or MTD. (*Id*. at Ex. C, Vol. II, 376:14-377:9.) Homme had no opinion as to whether the invoices and purchase orders generated by EAR and MTD were falsified or fraudulent: "A. We did not opine on, you know, whether certain documents were fraudulent or not. . . . I haven't made any conclusion on the specific invoices or the actual paper whether they're fraudulent or not . . . ." (*Id.* at Ex. B, Vol. I, 190:11-24; *see also id*. at 103:20-104:1; 191:8-13.) "I have no opinion on the creation of false invoices." (*Id*. at Ex. C, Vol. II, 378:20-21.) Nor did Homme independently verify any of the statements made by Mark Anstett concerning EAR's alleged fraud: "I did not take any specific steps to verify that information." (*Id*. at 299:6-11; *see also id*. at 369:10-18.) Just because Homme relied upon the Plea Agreement does not mean that its contents are true. *In re Lake States Commodities, Inc.*, 272 B.R. 233, 243 (Bankr. N.D. Ill. 2002) (expert's reliance upon hearsay document is "not . . . proof of the underlying matter" contained in the document); *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732 (10th Cir. 1993) ("The fact

that [the expert] relied upon the report in performing his calculation of lost profits did not relieve the plaintiffs from their burden of proving the underlying assumptions contained in the report."). [4]

Similarly, Homme did not examine, or form any opinions, on whether MTD or EAR actually bought or sold the equipment that lenders (including IBM Credit and TDEF) had financed. (Ex. B, Homme Dep. Vol. I, 168:18-163:4, *id.* at Ex. C, Vol. II, 284:14-17; 399:12-400:2; *id.* at Ex. D, Vol. III, 538:2-24.) Homme conceded: "I didn't do any analysis outside of my scope to do any analysis to or opine on a Ponzi scheme or how any one defendant may have been connected to it or not." (*Id.* at Ex. B, Vol. I, 83:11-15.) He also testified that "I do not have an opinion" on whether EAR was conducting a "Ponzi-like" scheme. (*Id.* at Ex. D, Vol. III, 641:11-14.) And Homme did not opine in his report or at his deposition that, with respect to equipment financed by IBM Credit, EAR falsified serial numbers; fraudulently inflated the value of equipment; or bought and sold the same equipment multiple times. (*Id.* at Ex. C, Vol. II, 482:8-483:5.)[5]

Rather than being retained to examine whether EAR was running a fraudulent equipment scheme, Homme clarified that his engagement was to "do a financial analysis of EAR, and part of that involved tracing the sources and uses of cash." (*Id.* at Ex. B, Vol. I, 16:10-12; *see also* 85:3-

---

[4] In his deposition, Homme confirmed that other than the flow of funds between MTD and EAR being fraudulent, he could not identify a reason why MTD would have remitted the money to EAR. (Ex. C, Homme Dep. Vol. II, 283:24-285:16.) Homme testified that he used his "common sense" in arriving at his conclusions that these transactions were fraudulent. (*Id.* at 286:6-14.) But "common sense" does not transform one's opinions into "expert" testimony. *Coffee v. Menard, Inc.*, No. 13 C 2726, 2015 WL 1399049, at *3 (N.D. Ill. Mar. 25, 2015) (excluding expert testimony: "Grisim simply draws common-sense conclusions that jurors without his experience are equally qualified to make.") (relying on *United States v. Christian,* 673 F.3d 702, 710–11 (7th Cir. 2013).) Nor does Homme have any experience in the equipment finance industry that would support his so-called "common sense" opinions. (Ex. C, Homme Dep. Vol. II, 287:24-288:3.)

[5] Homme's failure to investigate whether EAR bought and sold the same equipment multiple times underscores his lack of foundation to testify that EAR committed fraud, because "[t]he very heart of Plaintiff's case is that EAR and MTD were parties to a secret arrangement to sell, resell, lease and re-lease the same equipment over and over again, while pretending to the outside world that each new sale or lease transaction involved a fresh set of equipment." (Case No. 11-02215, Doc. 157, at 17-18.)

11

5.) Homme admitted that his sole basis for using the term "fraudulent financing transactions" was not as a result of any independent investigation he did, but rather, that he "picked up that phrase from the plea agreement" of Mark Anstett. (*Id.* at Ex. C, Vol. II, 344:23-25.)[6] When questioned why, given his admission that he was not opining that EAR conducted fraud, he chose the phrase "fraudulent financing transactions," Homme explained that he used the phrase simply as a moniker for the transactions between EAR and MTD: "I'm not giving an opinion on fraud. And my categorization into this category [of fraudulent financing transactions] was simply a way of identifying these transactions." (*Id.* at 344:12-16.) "It was the term that I decided made sense. I could have called it a lot of things. . . . I could have called it 'MTD' -- just 'MTD transactions.'" (*Id.* at 343:16-21.)

Homme is correct: he could have (and should have) described the transactions between MTD and EAR in terminology other than fraudulent or illegitimate. Homme was not engaged to, and did not, actually investigate whether EAR committed fraud. Thus, any testimony that EAR conducted "fraudulent" or "illegitimate" financing transactions would not be "based on sufficient facts or data" as expressly required by Federal Rule of Evidence 702. Put another way, any such testimony would be without foundation and unreliable. *United States v. Lupton*, 620 F.3d 790, 799 (7th Cir. 2010) (affirming exclusion of expert opinion that defendant had not committed fraud because of the expert's "lack of methodology."); *Amari Co. v. Burgess*, No. 07 C 01425, 2012 WL 5389787, at *15 (N.D. Ill. Nov. 2, 2012) (same: "Defendants have not established . . . that he used a reliable methodology."); *In re Lake States Commodities, Inc.*, 272 B.R. 233, 245 (Bankr. N.D. Ill. 2002) (criticizing expert's methodology in determining Lake States was insolvent and a Ponzi scheme, affording testimony no weight and stating that had challenging party brought a *Daubert*

---

[6] Despite that testimony, Homme also testified that he reached the conclusions in his report <u>before</u> reviewing Anstett's Plea Agreement. (*Id.* at 298:8-11.)

12

motion, testimony may have been excluded: "Moreover, Malek did not interview any former employees of Lake States. Instead, Malek relied on what the Trustee told him and the KPMG Report stated about the extent of the bank accounts and assets."); *Comer v. Am. Elec. Power*, 63 F. Supp. 2d 927, 934 (N.D. Ind. 1999) (barring expert opinion based upon expert's lack of factual foundation: "The point is, 'an opinion has a significance proportioned to the sources that sustain it,' and consequently an expert opinion that lacks a proper factual foundation is little more than 'unscientific speculation offered by a genuine scientist' . . .") (quoting *Huey v. United Parcel Serv.*, 165 F.3d 1084, 1087 (7th Cir. 1999) and *Rosen v. Ciba–Geigy Corp.*, 78 F.3d at 316, 318 (7th Cir. 1996)); *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 895 (7th Cir. 2011) (affirming exclusion of expert testimony because "he used no particular methodology to reach his conclusions.")[7]

---

[7] Homme's opinions are also irrelevant. His analysis is premised on comparing the legitimate fund sources with "fraudulent" payments. Thus, once the Court strikes the prohibited words "fraudulent" and "illegitimate" from Homme's Report and testimony, his remaining analysis will not help the fact finder resolve any issues of fact. Table 1 of his Report (Ex. A at page 6) would have no relevancy because it merely quantifies the potentially "legitimate" sources of funds as compared to other payments "related to the fraudulent financing transactions."

In addition, one of the ultimate issues for trial is whether Plaintiff can prove that the transfers EAR made to IBM Credit and TDEF as loan repayments can be traced back to a fraudulent scheme perpetrated by EAR, which transfers hindered, delayed, or defrauded EAR's "remaining creditors." *In re Equip. Acquisition Res., Inc.*, No. 09 B 39937, 2012 WL 4684819, at *2 (Bankr. N.D. Ill. Oct. 1, 2012) (emphasis added). *See also In re Equip. Acquisition Res., Inc.*, No. 09 B 39937, 2012 WL 4754916, at *3 (Bankr. N.D. Ill. Sept. 28, 2012) (stating same with respect to TDEF). Homme, however, did not trace the sources of cash used by EAR to make those loan repayments. He did not trace and agree the sources of IBM Credit's and TDEF's repayments to EAR's alleged fraudulent funds as distinguished from EAR's admitted "legitimate" funds. Thus, in further violation of Rule 702 and *Daubert*, Homme's opinion will cause confusion and not aid the fact finder.

13

**Conclusion**

When an expert repeatedly declares that a company engaged in "fraudulent financing transactions," but at the same time admits that opining as to the existence of fraud constitutes a legal conclusion — and admits he did not even investigate whether fraud occurred — his opinions are in direct contravention of Rule 702 and *Daubert*. Accordingly, IBM Credit and TDEF respectfully request that this Court: (a) bar Homme from testifying that transactions between MTD and EAR constituted "fraudulent" or "illegitimate" financing transactions; (b) strike all references in Homme's report describing transactions as "fraudulent" or "illegitimate"; and/or (c) strike Homme's expert report in its entirety.

                    Respectfully submitted,

                    By:    */s/ Stephen Pugh*
                    One of the attorneys for IBM Credit, LLC

Stephen H. Pugh
Jorge V. Cazares
Jonathan B. Cifonelli
Pugh, Jones & Johnson, P.C.
180 North LaSalle St., Suite 3400
Chicago, Illinois 60601
Tel: (312) 768-7800
Fax: (312) 768-7801

                  By:    */s/   Jeffrey D. Ganz*
                    One of the attorneys for TD Equipment Finance, Inc., successor by merger to TD Banknorth Leasing Corporation

Jeffrey D. Ganz
Riemer & Braunstein LLP
71 S. Wacker Drive, Suite 3515
Chicago, Illinois 60606
Telephone: (617) 880-3568
Facsimile: (617) 692-3568

2099943.1